United States District Court
Southern District of Texas
ENTERED
June 14, 2019
David J. Bradley, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**LAREDO DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **VS.** | § | **CRIMINAL ACTION NO. 5:18-CR-912** |
| | § | |
| **MOKTAR HOSSAIN; aka MUKTAR HUSSAIN; aka MUSA; aka MUSA BHAI; aka BABU BHAI; aka ASHRAF; aka ASHRAB; aka RICKY; aka CARLOS** | §<br>§<br>§<br>§ | |

**MEMORANDUM & ORDER**

Defendant Moktar Hossain stands charged with sixteen counts of alien smuggling. (Dkt. 1.) Now before the Court is Defendant's motion to suppress all evidence obtained as a result of the confession he made during a custodial interview on November 29, 2018. (Dkt. 40.) Defendant argues that (1) he did not validly waive his *Miranda* rights, and (2) even if his *Miranda* waiver was valid, his statements were not made voluntarily. (*See id.* at 11–18.) The Court held a hearing on June 4, 2019. Based on the evidence presented at the hearing and for the reasons discussed below, the Court finds that Defendant's *Miranda* waiver was valid and his statements were voluntary. Defendant's motion is therefore denied.

**Factual Background**

Defendant is a native and citizen of Bangladesh who resided in Mexico for approximately three years prior to his arrest. (Gov. Ex. 2-1 at 11.[1]) On November 20, 2018, a Laredo grand jury returned a sixteen-count indictment accusing Defendant of operating a human smuggling

[1] "Gov. Ex. 2-1" refers to the portion of the interview transcript that corresponds to the video and audio recorded on Disc 1 of Gov. Ex. 4. "Gov Ex. 2-2" refers to the portion of the transcript that corresponds to Disc 2 of Gov. Ex. 4. The Court makes this distinction only because these two sections of the transcript are separately paginated. The break between the two discs does not represent a break in the interview.

organization based in Monterrey, Mexico. (Dkt. 1 at 1–2.) In exchange for money, Defendant allegedly housed Bangladeshi nationals in Mexico, instructed them on how to cross the Rio Grande River without being detected by U.S. immigration authorities, and hired drivers to facilitate their transportation to the border. (*Id.* at 2.)

After the indictment was filed, the Court issued a bench warrant for Defendant's arrest. (Dkt. 5.) U.S. Homeland Security Investigations (HSI) agents in Monterrey coordinated with Mexican police and immigration officials to locate and apprehend Defendant. (Dkt. 42 at 2.) On the morning of November 29, 2018, Defendant was arrested in Monterrey and processed for deportation to Bangladesh through Houston, Texas. (Dkt. 40 at 2.) When his flight landed in Houston, Defendant was placed under arrest and taken to the HSI office at the airport. (Dkt. 42 at 2.) At 9:01 p.m., HSI Special Agents Ryan DiAndrea and Mohammed Rahman began an audio- and video-recorded interview of Defendant. (Gov. Ex. 2-1 at 1; *see* Gov. Ex. 4.) By his own account, Defendant is a native Bangla speaker who understands Spanish fairly well but does not know much English. (Gov. Ex. 2-2 at 13; *see* Gov. Ex. 2-1 at 3.) Accordingly, Agent Rahman, also a native Bangla speaker, conducted the interview in Bangla and provided occasional English translations for the benefit of Agent DiAndrea.[2] (Dkt. 40 at 2.) The interview was later translated into English and filed with the Court. (*Id.* at 3; *see* Gov. Ex. 2.)

Approximately twenty-seven minutes into the interview, Defendant waived his *Miranda* rights both verbally and in writing. (Gov. Ex. 1; *see* Gov. Ex. 4, Disc 1 at 26:20–27:22.) Although Defendant initially denied any involvement in alien smuggling (Gov. Ex. 2-1 at 9), he soon confessed that he had in fact trafficked between 60 and 80 Bangladeshi nationals to the

---

[2] At times, Agent DiAndrea formulated questions that Agent Rahman then translated into Bangla. (June 4, 2019 Hrg. at 11:15:27–11:15:55 a.m.) For simplicity's sake and because it may not have been apparent to Defendant each time a question originated with Agent DiAndrea, the Court will attribute all questions to Agent Rahman.

United States in the past year and a half (*id.* at 16–18). He described his role in the smuggling organization, explaining how he had arranged shelter and transportation for the aliens. (*Id.* at 18–29.) Defendant also reviewed photo arrays provided by the agents but claimed not to recognize anyone involved in his smuggling operation. (Gov. Ex. 2-2 at 2.) After taking a break, Defendant provided the names of four other Bangladeshi smugglers operating in Mexico and one operating in Costa Rica. (*Id.* at 3–4.) Finally, Defendant provided both verbal and written consent for law enforcement to search his three cell phones. (*Id.* at 8–12; *see* Gov. Ex. 5.) In total, the interview lasted slightly less than three hours. (*See* Gov. Ex. 2-2 at 14.)

In his motion to suppress, Defendant argues that (1) he did not validly waive his *Miranda* rights, and (2) even if his *Miranda* waiver was valid, his statements were not made voluntarily. (*See* Dkt. 40 at 11–18.) Although difficult to parse, Defendant's motion appears to raise four arguments bearing on voluntariness. First, Defendant suggests that the agents overbore his will by depriving him of food and rest. (*Id.* at 13–14.) Defendant then challenges three categories of statements made by Agent Rahman during the interview: (1) implied promises of leniency, (2) appeals to Defendant's religious beliefs, and (3) invocation of the safeguards afforded by the American criminal justice system. (*Id.* at 13–16.)

The Court held a suppression hearing on June 4, 2019. The Government called Special Agent Rahman as its sole witness. At the opening of the hearing, the Government acknowledged that it had recently discovered that some portions of the interview transcript were in fact summaries rather than verbatim transcriptions. (June 4 Hrg. at 9:13:27–9:24:35 a.m.; *see id.* at 9:31:49 –9:32:19 a.m.) Having considered Agent Rahman's professional experience, native fluency in Bangla, demeanor, and apparent candor and fairness, the Court found his testimony credible. Accordingly, where the parties disputed the content of statements made during the

interview that did not appear in the transcript, the Court relied on Rahman's on-the-stand translations. (*See id.* at 9:29:10–9:35:22 a.m.) The Court instructed the Government to obtain a revised verbatim transcript and advised defense counsel that he would be permitted to reopen the hearing or supplement the motion to suppress should the revised transcript differ materially from the original. (*See id.* at 12:15:33–12:17:35 p.m.)

## Legal Standards

### A. *Miranda* Waiver

The Fifth Amendment to the federal Constitution provides: "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. This privilege against self-incrimination applies during any custodial interrogation by law enforcement. *See Howes v. Fields*, 565 U.S. 499, 508–09 (2012). Accordingly, "the prosecution may not use statements . . . stemming from custodial interrogation . . . unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *see United States v. Andrews*, 22 F.3d 1328, 1337 (5th Cir. 1994). Typically, this requirement is satisfied by giving the defendant the customary *Miranda* warnings: that he has the right to remain silent, that anything he says can be used against him in court, that he has the right to an attorney, and that an attorney will be provided for him if he cannot afford to hire one. *Miranda*, 384 U.S. at 467–473; *see Florida v. Powell*, 559 U.S. 50, 60 (2010) (noting that although "[t]he four warnings *Miranda* requires are invariable, . . . this Court has not dictated the words in which the essential information must be conveyed").

If it wishes to introduce statements a suspect made after waiving his *Miranda* rights, the Government must show by a preponderance of the evidence that the defendant's *Miranda* waiver was valid. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *see Missouri v. Seibert*, 542 U.S.

600, 608–09 (2004). This inquiry has "two distinct dimensions." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). First, the waiver "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* Second, it "must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*; *see Maryland v. Shatzer*, 559 U.S. 98, 104 (2010). The validity determination "is made on a case-by-case basis and is viewed under the totality of the circumstances surrounding the interrogation." *United States v. Cardenas*, 410 F.3d 287, 293 (5th Cir. 2005).

**B. Voluntariness of Custodial Statements**

Even after a defendant has waived his *Miranda* rights, "coercive police activity" may render his statements involuntary and therefore inadmissible at trial. *Connelly*, 479 U.S. at 167. When a defendant challenges the voluntariness of his confession, "the Government must prove its voluntariness by a preponderance of the evidence." *United States v. Garcia Abrego*, 141 F.3d 142, 170 (5th Cir. 1998). The Government satisfies this burden if it shows that, "under the totality of the circumstances, the statement is the product of the accused's free and rational choice." *United States v. Broussard*, 80 F.3d 1025, 1033 (5th Cir. 1996). Indeed, police conduct will not invalidate a *Miranda* waiver unless it "constitute[s] such gross intimidation or coercion so as to overcome a defendant's free will." *Cardenas*, 410 F.3d at 295. Examples include violence or threats of violence, *Arizona v. Fulminante*, 499 U.S. 279, 287–88 (1991); prolonged deprivation of sleep, food, or water, *Payne v. Arkansas*, 356 U.S. 560, 567 (1958); *Ashcraft v. Tennessee*, 322 U.S. 143, 153–54 (1944); and extreme psychological pressure, *Harris v. Beto*, 367 F.2d 567, 568 (5th Cir. 1966) (per curiam).

The law recognizes that some degree of psychological maneuvering is a necessary part of

the interrogation process. *See Hawkins v. Lynaugh*, 844 F.2d 1132, 1140 (5th Cir. 1988) (Even where there is "little doubt but that the officers were hoping for psychological advantage by their tactics . . . , there is nothing inherently wrong with efforts to create a favorable climate for confession."). Accordingly, tactics held *not* to render confessions involuntary include: lying about the strength or extent of the evidence against a suspect, *United States v. Bell*, 367 F.3d 452, 462 (5th Cir. 2004); encouraging a suspect to tell the truth, *United States v. Paden*, 908 F.2d 1229, 1235 (5th Cir. 1990); stating that a suspect might face a long prison sentence or even the death penalty "if he did not admit" his guilt, *id.*; *see United States v. Ballard*, 586 F.2d 1060, 1063 (5th Cir. 1978); accusing a suspect of lying, *Cardenas*, 410 F.3d at 295; warning a suspect that "that the only way she could help herself [is] to talk to the [prosecutor]," *id.*; restraining a suspect with handcuffs during the interview, *id.*; and appealing to a suspect's religious beliefs, *Berghuis v. Thompkins*, 560 U.S. 370, 387 (2010).

In each case, the ultimate inquiry is whether, under the totality of the circumstances, the defendant's will was overborne by coercive interrogation tactics. *Dickerson v. United States*, 530 U.S. 428, 434 (2000); *see United States v. Robair*, 2003 WL 360015, at *5 (E.D. La. Feb. 14, 2003) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)) ("The court must assess [both] the characteristics of the defendant and the details of the interrogation.").

## Discussion

### A. Defendant validly waived his *Miranda* rights.

#### 1. *Defendant's waiver was voluntary.*

Agents Rahman and DiAndrea spoke with Defendant for approximately sixteen minutes before providing him a copy of the *Miranda* warnings. (Gov. Ex. 4, Disc 1 at 16:30–40; *see* Gov. Ex. 1.) It took Agent Rahman approximately ten more minutes to explain the warnings to

Defendant and obtain his unambiguous consent to continue the interview. (Gov. Ex. 4, Disc 1 at 26:20–27:22.) Defendant argues that the agents' pre-waiver interview tactics deprived him of the ability to make "a free and deliberate choice" about whether to waive his rights. *Moran*, 475 U.S. at 421. (*See* Dkt. 40 at 12–16.)

The interview recording shows that Defendant never exhibited signs of exhaustion, confusion, intoxication, or any other condition that might have impeded his ability to make a voluntary waiver. (June 4 Hrg. at 9:41:00–9:42:30 a.m.) Moreover, neither Defendant's motion nor defense counsel's presentation at the suppression hearing clearly articulated Defendant's grounds for objecting to the waiver's voluntariness. (*See* Dkt. 40 at 7–16.) Insofar as Defendant claims that his waiver was rendered involuntary by (1) his exhaustion and hunger or (2) the agents' implied promises of leniency, (3) religious references, or (4) discussion of the American law enforcement system, those claims are discussed and rejected below. *See infra* pp. 10–17. Insofar as Defendant bases his challenge on the agents' urgings to take advantage of the "opportunity" to "speak the truth" (*see, e.g.*, Gov. Ex. 2-1 at 5, 7), it is well established that "encouraging [a] defendant to be honest is not so coercive as to render the defendant's incriminating statements involuntary." *United States v. Tatum*, 121 F. Supp. 2d 577, 587 (E.D. Tex. 2000); *see also Ballard*, 586 F.2d at 1063 ("[E]ncouraging [a suspect] to tell the truth is no more than affording her the chance to make an informed decision . . . .").

In short, having reviewed the evidence and the testimony presented at the suppression hearing, the Court can find no sign that Defendant's waiver was involuntary. Accordingly, the Court concludes that Defendant's waiver "was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran*, 475 U.S. at 421.

**2. *Defendant's waiver was knowing and intelligent.***

Defendant argues that he did not understand the *Miranda* warnings because the written Bangla translation provided to him during the interview was defective. (June 4 Hrg. at 10:41:14–10:49:00 a.m.) Indeed, in an email sent to Agent DiAndrea the day before the interview and in his testimony on the stand, Agent Rahman acknowledged that the Bangla translation was awkwardly worded and, in a few places, simply incorrect. (June 4 Hrg. at 9:45:17–9:47:19 a.m.) For example, the warning regarding Defendant's right to remain silent was confusingly translated as: "My duty: You have the right to remain silent." (Gov. Ex. 1 at 2.) The warning regarding the right to counsel appears to invert the operation of the right. It reads: "If you do *not* want an attorney, then one will be appointed for you before you are asked any questions." (*Id.* (emphasis added)) Agent Rahman acknowledged these and other errors and admitted that the Bangla translation would likely be inadequate if it were the only information Defendant received about his *Miranda* rights. (*See* June 4 Hrg. at 10:48:38–10:49:00 a.m.)

However, the written translation was not the only—or even the primary—method by which the *Miranda* warnings were delivered. Rather, Agent Rahman translated the warnings aloud from his own English copy one at a time. By translating directly from the standard English warnings, Agent Rahman was able to provide a correct Bangla interpretation and ensure that the translation errors in the hard-copy Bangla form would not impede Defendant's understanding of his rights. (June 4 Hrg. at 9:48:05–9:48:42 a.m.; *see* Gov. Ex. 6.) Indeed, as Agent Rahman explained the rights, Defendant confirmed both verbally and by nodding his head that he understood each one. (Gov. Ex. 4, Disc 1 at 18:35–19:45; Gov. Ex. 2-1 at 6–7.) Moreover, the video recording shows that Defendant's attention was focused on Agent Rahman's oral translation throughout the *Miranda* discussion, and that Defendant never expressed any

confusion about the written translation. (Gov. Ex. 4, Disc 1 at 18:00–19:45; June 4 Hrg. at 9:49:04–9:50:17 a.m.) Finally, the agents took pains to obtain an explicit oral waiver in addition to the written waiver. After explaining each *Miranda* right and before eliciting any incriminating information, Agent Rahman asked Defendant, "Are you ready to speak?" and Defendant responded, "Absolutely."[3] (Gov. Ex. 4, Disc 1 at 26:02–27:16; June 4 Hrg. at 11:48:02–11:50:00 a.m.)

In short, the agents scrupulously adhered to *Miranda*. Not only did they provide both oral and written warnings, but they also obtained verbal confirmation that Defendant understood each of his rights and wished to continue speaking with them. The deficiencies in the written Bangla translation did not render Defendant's waiver involuntary. In fact, Defendant's waiver would have been valid even if he had never received a written copy of the warnings. *See North Carolina v. Butler*, 441 U.S. 369, 370–72 (1979) (holding that a suspect's oral waiver may establish voluntariness even if he refuses to sign a written waiver); *Cardenas*, 410 F.3d at 294–95 (holding that the absence of a written waiver form does not establish involuntary waiver where the suspect receives and understands oral warnings). Because Defendant received clear oral warnings and responded with clear oral confirmation of his desire to speak with the agents, the mistranslations in the Bangla form have no bearing on the voluntariness of Defendant's

[3] Because this exchange was omitted from the transcript, the Court relied on Rahman's on-the-stand translation of Defendant's oral waiver. Even if Rahman's translation proves incorrect and the revised transcript shows that Defendant did not expressly agree to continue speaking with the agents, the fact that Defendant *did* continue speaking with them after indicating that he understood his rights constitutes an implied waiver. *See United States v. Oliver*, 630 F.3d 397, 410 (5th Cir. 2011) (quoting *Berghuis*, 560 U.S. at 388–89) ("[A] suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police.").

waiver.[4]

**B. Defendant's statements were voluntary.**

***1. The agents did not deprive Defendant of sleep or food.***

Defendant argues that regardless of whether his *Miranda* waiver was valid, his confession was involuntary because the agents overbore his will by depriving him of food and rest. (*See* Dkt. 40 at 13.) Defendant was arrested by Mexican authorities at approximately 8:00 a.m. on November 29, 2018, and the interview began at 9:01 p.m. that night. (Dkt. 40 at 2.) Agent Rahman testified that although Defendant had an opportunity to sleep en route to Houston, he did not know whether Defendant had been offered food after his arrest. (June 4 Hrg. at 9:38:09–9:38:22 a.m.) In theory, then, it is possible that at the time the interview began, Defendant had been awake for over thirteen hours and had not eaten in a day.

However, a confession cannot be suppressed as involuntary unless it is the product of the interrogators' own misconduct. *See Connelly*, 479 U.S. at 170 ("The sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion."). Specifically, where a defendant claims involuntariness based on lack of sleep or food, there must be evidence "that Defendant requested additional time to rest or requested food, that Defendant complained about his condition, or that the officers conditioned additional rest time or food on receiving a confession." *United States v. Mitchell*, 2013 WL 5300687, at *5 (N.D. Tex. Sept. 20, 2013)

[4] At the end of the interview, Agent Rahman asked for consent to search Defendant's cell phones. (Gov. Ex. 2-2 at 8–12; *see* Gov. Ex. 5.) Although the consent-to-search form was written only in English, Agent Rahman explained what it said in Bangla and made clear that Defendant could refuse to sign it, after which Defendant unambiguously authorized the agents to "see everything in the phone[s]." (Gov. Ex. 2-2 at 8–9.) To the extent Defendant might seek to challenge the consent form separately from the *Miranda* waiver, the Court's analysis applies equally to both. (*See* June 4 Hrg. at 10:15:02–10:16:20 a.m., 10:57:47–10:58:10 a.m.) The agents did not coerce, threaten, or improperly persuade Defendant to authorize the search. Thus, the Court will not suppress any evidence obtained from the inspection of Defendant's cell phones.

(citing *Muniz v. Johnson*, 132 F.3d 214, 220 (5th Cir. 1998)).

In this case, although Defendant may have gone without food or sleep for some hours before the interview, the agents did nothing to cause or exploit that deprivation. To the contrary, the evidence shows that the agents were attentive to Defendant's needs throughout the interview and did as much as they could to make him comfortable. Although there was no food available, the agents made clear that Defendant could have as much water as he liked (Gov. Ex. 2-1 at 2) and gave him the few pieces of candy they had on hand (June 4 Hrg. at 9:40:02–9:40:14 a.m.). Throughout the interview, Defendant was seated in a padded chair across a table from the two agents. (Gov. Ex. 4, Disc 1 at 00:00–00:11.) He was not handcuffed or otherwise restrained, and he wore comfortable attire. (*Id.*)

Though Defendant initially reported that he had not slept the night before the interview, he appeared alert and did not indicate physical discomfort or mental impairment. (*Id.*; *see* Gov. Ex. 2-1 at 2.) Most importantly, at no point did Defendant ask for food or rest, nor did he object to further questioning on grounds of hunger or exhaustion. (June 4 Hrg. at 11:59:05–11:59:48 a.m.) In fact, Defendant gave no indication whatsoever that his judgment might be clouded by exhaustion or hunger. He was alert and responsive throughout the interview and appeared to understand everything said by the agents. Given that the agents neither directly deprived Defendant of rest or food nor had reason to suspect that Defendant was too tired or hungry to proceed, the Court finds no Government overreach that could warrant suppression. *See United States v. Guanespen-Portillo*, 514 F.3d 393, 404 (2008). (Where the defendant "did not indicate that he was held without food or rest for a long period of time or that his hunger and tiredness were in any part the fault of government agents," there was no "coercive activity by law enforcement officers, . . . a predicate for finding a waiver or confession to be involuntary.").

**2. *Implied promises of leniency did not render Defendant's statements involuntary.***

At several points during the interview, Agent Rahman implied that Defendant's cooperation might result in a more lenient sentence. "You need to help yourself," Rahman admonished Defendant shortly after he was Mirandized. "Or else, you will spend a lot of time in jail. If you don't speak the truth right now, this country may not help you anymore." (Gov. Ex. 2-1 at 15.) Later, Rahman urged Defendant to identify other smugglers by warning him: "[Y]ou are looking at a lot of time in jail. You are the only person we have. You are the only person we have to blame." (*Id.* at 30.) Shortly thereafter, Rahman warned Defendant that his "future in the jail may be a long time" but suggested his sentence might be shorter if he assisted authorities in identifying other traffickers. (Gov. Ex. 2-2 at 1.) Defendant argues that these implied promises of leniency were improper because the agents could not in fact guarantee a shorter sentence in exchange for cooperation. (June 4 Hrg. at 11:15:04–11:18:33 a.m.)

"It is true that certain direct or implied promises of leniency may be 'so attractive they render a resulting confession involuntary' if the promise is not kept." *United States v. Fernandes*, 285 F. App'x 119, 124 (5th Cir. 2008) (per curiam) (quoting *Streetman v. Lynaugh*, 812 F.2d 950, 957 (5th Cir. 1987)). However, "indirect promises do not have the potency of direct promises," *Hawkins v. Lynaugh*, 844 F.2d 1132, 1140 (5th Cir. 1988), and "a confession is not involuntary merely because the suspect was promised leniency if he cooperated with law enforcement officials," *United States v. Santiago*, 410 F.3d 193, 202 (5th Cir. 2005). Rather, a court must consider the totality of the circumstances surrounding an implied promise, including the mental limitations of the suspect, the conditions of the interview, and any other problematic statements or conduct by the interviewers. *See Dickerson*, 530 U.S. at 43; *Jurek v. Estelle*, 623 F.2d 929, 937 (5th Cir. 1980).

In this case, Defendant was comfortable, alert, and articulate throughout the interview. As discussed above, Defendant showed no signs of a compromised mental state. *See supra* pp. 7, 11. Moreover, the Court has not identified any improper conduct or coercive statements by the agents that, in combination with the implied promises of leniency, might have overborne Defendant's will. *See Dickerson*, 530 U.S. at 43. As other courts have recognized, it is not coercive to "explain that honesty might be the best policy for a criminal who hopes for leniency from the state." *Miller v. Fenton*, 796 F.2d 598, 605 (3d Cir. 1986); *see United States v. McFarlane*, 309 F.3d 510, 513 (8th Cir. 2002) ("[T]he fact that a criminal defendant faces difficult choices does not necessarily compel the individual's choice so as to implicate the Fifth Amendment.").

In *United States v. Okafor*, for example, the Ninth Circuit rejected the defendant's claim that his will was overborne by an agent's statement that "he would be subject to 10 to 20 years in prison" if convicted but that "cooperation could help [him] avoid a lengthy prison sentence." 285 F.3d 842, 846–47 (9th Cir. 2002). In the Ninth Circuit's view, accurate representations of the potential consequences a suspect faces may well "create incentives for cooperation," but they do not cross the line into coercion "unless under the total circumstances it is plain that they have overborne the free will of the suspect." *Id.* at 847.

Agent Rahman's statements were somewhat more forceful than those at issue in *Okafor*. Nevertheless, the Court is persuaded that under the totality of the circumstances, Agent Rahman's implied promises of leniency "fall[] within the spectrum of permissible representations." *Hawkins*, 844 F.2d at 1140. Although the mentions of jail time and the benefits of cooperation likely "play[ed] a part in the suspect's decision to confess," that confession was ultimately the "product of [Defendant's] own balancing of competing considerations," not of

official coercion. *Miller*, 796 F.2d at 605.

**3. *Appeals to Defendant's religious beliefs did not render Defendant's statements involuntary.***

Agent Rahman appealed to Defendant's Muslim faith three times during the interview, once before Defendant waived his *Miranda* rights and twice after.[5] At the beginning of the interview, Rahman asked Defendant if he prayed regularly and discussed his mother's religious pilgrimage. (Gov. Ex. 2-1 at 2.) Then, after Defendant had been Mirandized, Rahman told him: "[W]e are both Bangladeshis. . . . At the end of the day, we are Bangladeshis. . . . And, we are Muslims." (*Id.* at 10.) Finally, after Defendant had confessed but before he had identified any other traffickers, Defendant stated: "If I knew [that I would be arrested] I would not have done this work." (*Id.* at 25.) Rahman responded: "[W]e all understand. The main thing is no person in this world is like our Prophet. That is fine. But that is before. . . . What will happen to you in the future will depend on you." (*Id.*)

Defendant argues that Agent Rahman used these religious references to coerce him into confessing. (Dkt. 40 at 17; *see* June 4 Hrg. at 10:31:45–10:32:20 a.m.) Agent Rahman testified that he invoked their shared religion and cultural background not to pressure Defendant into confessing but to build rapport—an interview strategy recognized and approved by the Fifth Circuit. (June 4 Hrg. at 10:56:41–10:57:02 a.m., 11:13:33–11:15:01 a.m.) *See United States v. Barlow*, 41 F.3d 935, 944 (5th Cir. 1994) (per curiam) (acknowledging that police may seek "to establish a congenial, supportive rapport with [a defendant] to encourage [him] to speak freely"). The Court finds Rahman's explanation for his statements credible. Given that Rahman had little

[5] Translated literally, the Bangla expression Agent Rahman used to greet Defendant means "Peace be upon you" and is associated with Muslim religious beliefs. (Gov. Ex. 2-1 at 1.) However, because it is a standard Bangla greeting used to indicate respect, the Court does not consider it an express invocation of religion. (*See* June 4, 2019 Hrg. at 10:12:47–10:13:27 a.m., 10:56:40–10:56:46 a.m.)

else in common with Defendant and that Defendant had never been in the United States or in legal trouble before, it was proper police procedure to make Defendant feel more comfortable by minimizing the social and cultural gap between him and his interviewers.

In any case, it is well established that "the Fifth Amendment privilege is not concerned with 'moral and psychological pressures to confess emanating from sources other than official coercion.'" *Connelly*, 479 U.S. at 170 (quoting *Oregon v. Elstad*, 470 U.S. 298, 304–05 (1985)). Any guilt or psychological strain Defendant experienced upon hearing references to Islam was the result of his own, internal values and beliefs. Indeed, the Supreme Court has held that religious references much more clearly aimed at producing a confession than the ones at issue here do not render a defendant's statements involuntary. In *Berghuis v. Thompkins*, a murder suspect had refused to speak more than a few words to investigators for nearly three hours. 560 U.S. at 375–76. Finally, an officer asked the suspect:

> "Do you believe in God?" Thompkins [the suspect] made eye contact with Helgert [the interviewer] and said "Yes," as his eyes "welled up with tears." Helgert asked, "Do you pray to God?" Thompkins said "Yes." Helgert asked, "Do you pray to God to forgive you for shooting that boy down?" Thompkins answered "Yes" and looked away. Thompkins refused to make a written confession, and the interrogation ended about 15 minutes later. Thompkins was charged with first-degree murder, assault with intent to commit murder, and certain firearms-related offenses.

*Id.* at 376 (internal citations and alterations omitted). On habeas review, the Supreme Court found no constitutional error in the trial court's denial of Thompkins' motion to suppress. *Id.* at 387. In the Court's view, "[t]he fact that Helgert's question referred to Thompkins' religious beliefs . . . did not render Thompkins' statement involuntary" because it appealed only to Thompkins' internal psychological disposition. *Id.*

Compared to the line of questioning approved in *Berghuis*, Agent Rahman's religious references are innocuous. Rahman did not attempt to link Defendant's faith to a moral duty to

confess, nor did he imply that God would judge him for his alleged crimes. *See United States v. Whitmore*, 386 F. App'x 464, 471 (5th Cir. 2010) ("[A]n interrogating officer's mere reference to religious beliefs does not alone invalidate a confession."). There is no doubt that Rahman invoked religion in order to build common ground with Defendant and make him comfortable enough to tell the agents the truth. However, "[u]se of a psychiatrically-oriented technique is not improper merely because it causes a suspect to change his mind and confess." *State v. Miller*, 388 A.2d 218, 224 (N.J. 1978). In this case, Agent Rahman's invocation of religion was shrewd police work, not coercion.

**4. *Agent's explanation of American legal safeguards was not coercive.***

Agent Rahman reassured Defendant several times, both before and after he was Mirandized, that the United States justice system observes the rule of law and respects the rights of the accused. (*See* Gov. Ex. 2-1 at at 4–6, 12; Gov. Ex. 2-2 at 1, 13.) At times, Rahman implied that Defendant would have been treated harshly or even violently had he been arrested in Bangladesh or Mexico, so he should be grateful that he was in American custody instead. (Gov. Ex. 2-1 at 4–5, 12; Gov. Ex. 2-2 at 1; *see* June 4 Hrg. at 10:58:46–10:59:03 a.m.) Although the motion to suppress does not clearly articulate Defendant's grounds for objecting to these statements, Defendant appears to argue that Agent Rahman's references to foreign police practices could be construed as a threat. (*See* Dkt. 40 at 17.)

For his part, Agent Rahman testified that he sought only to allay any fears of police brutality or harsh treatment Defendant may have harbored as a result of his prior residence in Bangladesh and Mexico. (June 4 Hrg. at 12:03:40–12:04:27 p.m.) The Court finds Agent Rahman's explanation credible. His references to American legal norms could not reasonably be interpreted as a threat. If anything, a *failure* to explain American legal safeguards might have

misled Defendant into believing he risked physical harm or deprivation if he did not confess. *Cf. United States v. Abu Khatallah*, 275 F. Supp. 3d 32, 67 (D.D.C. 2017) (considering and rejecting the defendant's argument that his *Miranda* waiver was involuntary because his prior exposure to "tyrannical" Libyan authorities led him to believe he would be killed if he did not cooperate). Certainly, Agent Rahman hoped that Defendant would speak more openly once his fear of mistreatment had been assuaged, but the "mere fact that law enforcement agents . . . attempted to create a favorable climate for confession" does not render a defendant's statements involuntary. *Garcia Abrego*, 141 F.3d at 170–71.

**Conclusion**

Having considered the evidence in the record, the arguments presented at the suppression hearing, and the totality of the circumstances surrounding Defendant's custodial interview, the Court finds that Defendant validly waived his *Miranda* rights and made a voluntary confession. Accordingly, Defendant's motion to suppress (Dkt. 40) is hereby DENIED.

A final pretrial conference is scheduled before the undersigned on **August 8, 2019 at 9 a.m.**

IT IS SO ORDERED.

SIGNED this 14th day of June, 2019.

Diana Saldaña
United States District Judge